Elaine G. PARKER, Appellant,

v.

SECRETARY, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Appellee.

No. 88–5295.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1989.

Decided Dec. 8, 1989.

James E. McCollum, Jr., College Park, Md., for appellant.

Diane M. Sullivan, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, Michael J. Ryan, Asst. U.S. Attys. and Carol W. Bernstein, Attorney, U.S. Dept. of Housing and Urban Development, Washington, D.C., were on brief for appellee.

Before MIKVA, EDWARDS and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Appellant Elaine Parker appeals the district court's judgment for the Department of Housing and Urban Development ("HUD") in this Title VII action. Parker, a former auditor at HUD, alleged that HUD had discriminated against her on the basis of her race and/or sex in its decisions to demote her from a grade GS-13 to GS-11 and to deny her a within-grade pay increase. In addition Parker alleged that her supervisors had subjected her to discriminatory treatment by, *inter alia,* denying her educational opportunities accorded to others, failing to accord her the respect accorded white male GS-13 auditors in her department, and denying her the opportunity for a weekend return to her home during an extended field audit. The district court concluded that while Parker established a prima facie case of discrimination, she did not meet her burden of proving that the government's reasons for adverse employment actions were a pretext for discrimination. In reaching this conclusion the district court stated that the evidence of the merit of Parker's work was immaterial because Parker had not shown that the managers "were so clearly wrong that they, in fact, knew that they were." We reverse this judgment because the district court did not apply the correct legal standards regarding what Title VII plaintiffs must prove to demonstrate pretext. We remand for further proceedings consistent with this opinion.

## I. Background

### A. *Parker's Work Experience*

Elaine Parker, a black female, began her career with the federal government as a clerk typist in 1964. Through evening education she received her B.A. degree in accounting in 1975 and advanced to the position of auditor, first at the Department of Transportation as a GS-7, progressing to a GS-11. Later she moved to the Department of Commerce to work as a GS-12 Auditor-Manager. In 1979 Parker applied and was selected for a position at HUD. She entered HUD as a GS-13 supervisory auditor in the Technical Services Division of the Office of the Inspector General ("OIG"), which was headed by Glen Dale.

Mr. Dale interviewed Ms. Parker for this position. At trial Parker testified that upon meeting her, Dale appeared startled, stating that he had assumed Parker was white because of her maiden name, Garbett. According to Parker, the entire interview proceeded in a discriminatory fashion because Dale: (1) suggested incorrectly that she had falsified her qualifications form; (2) suggested that being a black female was an "asset" that led to Parker's advancement; and (3) failed to discuss the substance of the job position. Dale testified that he did not recall anything about the interview other than discussing "varying aspects of the job and so forth." Dale did not recommend Parker for the job, he testified, because, based on her application and the interview, he did not believe she had the necessary writing and oral skills for the position. Dale conceded that he never saw a writing sample. Dale recommended a white female for the job but Dale's supervisor, Mr. Yazurlo, selected Parker. At the time Parker was the only black, female auditor at HUD in grades 13 through 15.

Parker spent her initial year at HUD working under Dale. The three other GS–13's in the department were all white males. Parker asserted at trial that Dale initially gave her little work to do and then gave her "above-grade" tasks which the other GS–13's in her group were not required to complete. Dale denied these allegations. Early in Parker's tenure with HUD, Dale sent Parker to San Francisco to work on an audit of a mortgage company. Dale testified that this was part of Parker's "training" and that he sent her to San Francisco, as opposed to a closer location, because ninety percent of the agency's "Mortgage Review Board" cases came from the San Francisco region. Parker testified that Dale told her that there were three other audits that were geographically closer, including one in Washington D.C., but that he felt she would get the best exposure in California. Parker was assigned to supervise three lower grade employees who, because of her unfamiliarity with the mortgage area, knew more about the audit than she did. The audit took about five weeks to complete.

During the entire audit Parker did not return home for a weekend visit, despite a HUD policy which would have allowed such a visit after two weeks. Parker claims that Dale told her before she left that his budget would not allow such a visit. According to Parker, after her supervisor in California intervened on her behalf, Dale called her two days before the audit was to be completed and told her to "come home" because he was getting heat about her lack of a weekend visit. Parker said she would rather complete the two remaining days before returning home. Dale testified that he called Parker at the end of *two* weeks to tell her she was entitled to a weekend return, to which Parker replied, "'If I come home now it will just draw the thing out and it will make it longer. I would like to stay and get it over with.'" Thus, according to Dale, at the end of four weeks Parker called him saying she wanted to come home at which point he told her it made no sense with just a few days to go. Parker claimed that no other GS–13's in the group did field audits while she was in Dale's department although Dale refuted this claim.

Upon return from California, Dale informed Parker that he was going to give her a warning letter regarding her performance. He admitted, however, (1) that he had not yet reviewed her performance on the California audit; (2) that the audit was in fact a "training function;" and (3) that "[s]he could have improved during that period out there." Although Dale prepared the warning letter, he never gave it to Parker because Mr. Yazurlo intervened and arranged for Parker's transfer to the Audit Operations Division under the supervision of George Henderson, a black male.

On two occasions Parker requested Dale's assistance in getting approval for certain educational opportunities. After Parker had been with HUD for six months, Dale refused to fill out an evaluation form that Parker requested in order to enroll in an executive management program. During the same period Parker requested consideration for a graduate program at American University which HUD sponsored for its employees. Dale also refused to recommend Parker for this program. Dale testified that at that point he did not feel he knew enough about Parker to give her a recommendation. Parker also testified that a white male who assumed the position she had held in Dale's department, successfully applied under Dale for the American University program within two months of transferring to that department. Dale testified that the male in question had been a HUD employee for several years prior to transferring to his department.

Parker also claims that Dale made derogatory statements to her such as "women like you should be home having babies." Dale denied having made such remarks or any sexist or racist remarks. Dale's former secretary testified that she believed Dale preferred men on his staff and that he rated them higher than Parker and another female auditor. Parker claimed that Dale treated her differently than the other GS–13's he supervised, claiming that Dale was hostile toward her while his other supervi-

sees were afforded an open-door rapport with him. Dale denied these assertions.

At trial Parker conceded that she had a good working relationship with her immediate supervisor, Mr. Henderson, during her first six months as an "area audit supervisor" in the Audit Operations Division of HUD's OIG. Mr. Kirkendall, a white male GS–15, was head of that division and was Parker's second line supervisor. Once transferred to Audit Operations, Parker immediately was assigned to a complex audit which had been initiated by another GS–13 auditor, with whom Parker had exchanged positions. The assignment was an audit of HUD's payroll system, "TOPPS." Parker testified that the audit was in a chaotic state and that within one month of taking it over, Henderson requested that she start compiling her findings in a written report. Parker was supervising three other auditors on the project. She claimed that she repeatedly requested additional time to develop data; in particular she claims that she alerted Henderson to the fact that payroll checks were being sent to persons no longer employed at HUD and that in order to find the source of the problem, a computer test was needed. Henderson agreed but further testified that they decided not to order the test because it would take months to complete. Henderson testified that he, Kirkendall and Parker jointly made this decision.

In October, 1980, Henderson reviewed several of Parker's early drafts of the TOPPS report and gave her a "fully satisfactory" performance rating. He noted, however, that she needed to improve her writing and data recordation skills. In the months prior to issuing this performance evaluation, Henderson had worked closely with Parker in trying to "beef up" the factual support for the report and get the report in an acceptable form. Parker suggested that he micro-managed her, flooding her with written requests for justification of her actions rather than using oral communication. At some point after the October evaluation, Henderson took Parker off the TOPPS audit and assumed responsibility for finalizing the report. She claimed she was not informed as to why she was taken off the audit. In January of 1981, Henderson conducted a thorough review of the TOPPS audit and another complex audit to which Parker had been assigned, the "GNMA Audit". He then issued a 60–day warning letter advising Parker that if she did not improve her performance, she would be denied a within-grade increase. Henderson's chief concern with the TOPPS and GNMA audits was that the data generated during the audits did not support the written findings and conclusions.

Parker testified that prior to this warning letter she was not told of any serious performance problems and she suggested that she was made the "fall guy" for management's decision not to perform computer testing in the TOPPS audit. Mr. Kirkendall's superior ordered independent reviews of the GNMA and TOPPS audits, and the reviews criticized the performance of both Parker and Henderson. The report concluded that both Henderson and Parker had performed unsatisfactorily.

After the warning letter, Parker was assigned to two less complex audits to give her a chance to improve her performance. Because he observed little improvement, Kirkendall asserted, he denied Parker's within-grade increase in May, 1981. In July of 1981, Kirkendall issued to Parker a notice of intention to assign an end-of-year unsatisfactory rating and a 60–day period for improvement. After a determination by Henderson and Kirkendall that there had not been any improvement during the following 60 days, Kirkendall issued to Parker an unsatisfactory rating and proposed to downgrade her from a GS–13 to GS–11. Kirkendall testified that he selected the GS–11 level because Parker had demonstrated performance problems on "contract" audits ordinarily performed by much less senior auditors and because many GS–12 auditors are required to act in significant supervisory capacities. Prior to making a final decision on the downgrade, the Deputy Inspector General, Paul Adams, ordered the independent review of Parker's work. Adams concluded that the information in this review supported downgrading Parker. At the time, Parker was the only

employee in the department who had ever been downgraded, with the exception of a white male who had an acute alcoholism problem.

Another black female who replaced Parker, Dorothy Norwood, was also downgraded from a GS–13 to a GS–11. She filed an EEO claim which HUD settled and is now a GS–12 at another agency.

B. *The District Court's Decision*

Prior to initiating this action, Parker appealed HUD's decision to demote her to the Merit Systems Protection Board ("MSPB"). In December, 1985, the MSPB sustained the demotion without addressing the issue of employment discrimination. In June, 1981 Parker had filed a formal discrimination complaint against HUD alleging that actions were taken against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16 (1982). Prior to receiving a final decision from the EEOC, Parker filed this action in district court, alleging sexual and racial discrimination in violation of Title VII. Parker charged that HUD had discriminated against her because of her race and/or sex by, *inter alia:* (1) demoting her from Auditor, grade GS–13 to GS–11; (2) denying her a within-grade pay increase; (3) denying her training opportunities accorded to others; (4) deliberately assigning her above-grade duties before she had an adequate opportunity to become trained; (5) failing to follow HUD policies, including an unjustified denial of a weekend home visit from an extended field audit; and (6) failing to accord her the status and treatment accorded white male GS–13 auditors, including subjecting her work to an unusual standard of scrutiny.

After a five-day trial, the District Court entered judgment from the bench immediately after closing argument. In a three page memorandum order, the court apparently concluded that Ms. Parker had established a prima facie case of racial and/or sexual discrimination, stating that the "adverse employment decisions were made respecting her which could conceivably have been motivated by prejudice." The court reasoned, however, that Parker failed to carry her burden of demonstrating that the legitimate, non-discriminatory reasons given for the adverse employment decisions were pretextual. Although some other blacks and females had "subjective impressions of racial and/or sexual bias permeating the agency's management," the court concluded that none of these witnesses were "materially similarly situated" to Parker. The court found Parker to be a "sincere" witness and stated that it believed her, "to the extent that *she* believes she is a victim of discrimination." It credited, however, "the testimony of the several managers alleged to be discriminating officials in their denials ... and ... their testimony as to the reasons given for their adverse employment decisions."

In concluding that Parker had failed to carry the burden of persuasion, the court stated that the plaintiff's evidence with respect to the merits of her work "would only be material if there were evidence to prove that the managers were so clearly wrong that they, in fact, knew that they were, and consequently, another motivation for their decisions must be inferred." In addition, the court opined that "[i]t is contrary to experience and common sense to expect that any of [the supervisors] would deliberately violate the law of the government in which they serve, and a finding to that effect would have to be based on more than evidence of their personal opinions."

## II. Analysis

A. *The Standards for Demonstrating Pretext*

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the basic allocation of burdens and order of presentation of proof in Title VII cases alleging discriminatory treatment. The Court aptly summarized the *McDonnell* ruling in a later case:

> First, the plaintiff has the burden of proving by the preponderance of evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate

some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1980) (citing *McDonnell,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25). At issue in the instant case is the legal standard governing the means which a plaintiff may employ to demonstrate pretext. As the Supreme Court explained in *Texas Dept. v. Burdine,* if the defendant carries its burden of rebutting the presumption raised by the prima facie case, i.e. if it raises a genuine issue of fact by offering evidence of legitimate, nondiscriminatory reasons, then "the factual inquiry proceeds to a new level of specificity." 450 U.S. at 255, 101 S.Ct. at 1094.

The plaintiff's burden of demonstrating pretext merges with the ultimate burden of persuasion, which she retains. She may succeed in demonstrating pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256 (citing *McDonnell,* 411 U.S. at 804–05). Evidence relevant to demonstrating pretext might include: (1) a showing that materially similarly situated white or male employees did not receive the same adverse action received by the plaintiff; (2) facts as to the employer's treatment of the plaintiff during the term of employment; and (3) the employer's general policy and practice with respect to employment of minorities and women. Statistical information as to an employer's policies and practices may also be used to help show that the employer's adverse actions conformed with a pattern of discrimination against minorities or women. *See McDonnell,* 411 U.S. at 804–05, 93 S.Ct. at 1825–26.

B. *Application of Standards to Parker's Case*

We note that Parker's case involves two types of allegations. First, she claims she was discriminated against in being demoted and denied a within-grade pay increase. Second, she asserts that she endured discrimination on the job through adverse actions, e.g. denial of access to educational opportunities, which other non-black and/or non-female employees were not subjected to. Most of the allegations in this second class pertain to the purported actions of Mr. Dale. Turning to the district court's disposition of this case, we agree with the district court that Parker succeeded in establishing a prima facie case of discrimination with respect to the first class of allegations and to a limited extent regarding the second class. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dept. v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Parker needed only to prove by a preponderance of the evidence that adverse actions were taken against her under circumstances giving rise to an inference of unlawful discrimination. Thus, her status as a racial minority and a woman, her apparent qualifications for the job which she held, and her singular treatment in being demoted two grades give rise to such inference. *See id.* at 253 & n. 6, 101 S.Ct. at 1093 & *n.* 6. (describing an appropriate model for a case of prima facie discrimination). Similarly, the fact that Parker as a black female was denied educational opportunities when another white male employee was not, gives rise to an inference of discriminatory treatment.

To the extent, however, that the record does not establish that other adverse actions were in fact taken against Parker, we are unable to apply the *McDonnell* analysis. For example, it is not clear from the court's findings or the record before us that Mr. Dale in fact assigned Parker above-grade work or denied her a home visit during the California audit. The efficacy of these residual allegations turn on credibility determinations which the court was required to make. The court "cred-

it[ed] the testimony of the several managers alleged to be discriminating officials *in their denials* ... *and* credit[ed] their testimony as to the reasons for their *adverse employment decisions* respecting plaintiff." (emphasis added). This finding, however, does not articulate clearly how the district court intended to dispose of those allegations other than the demotion and pay increase matters—adverse actions which, if taken, could not be justified solely with reasoning tied to Parker's work performance. If on remand it were established that Dale's alleged treatment of Parker, e.g. disparate treatment in assigning work, constituted a violation of Title VII, Parker may be entitled to attorneys fees as a form of equitable relief available under the Act. *Bundy v. Jackson*, 641 F.2d 934, 946 n. 12 (D.C.Cir.1981).

To the extent that adverse actions taken against Parker plausibly relate to work performance, we affirm the district court's conclusion that HUD offered legitimate, non-discriminatory reasons for such action. With respect to the denial of educational opportunities, it may be that Mr. Dale articulated legitimate reasons for his actions, but the district court must make findings to that effect.

■ We find that the court erred in its statements of law with respect to Parker's burden of demonstrating that HUD's reasons for adverse actions were pretextual. The court's pronouncement as to the immateriality of Parker's evidence on the merits of her work has no basis in the law. The court claimed that Parker's evidence of her work performance—more appropriately, her attempt to show that she was singled out for adverse treatment—"would only be material if there were evidence to prove that the managers were so clearly wrong that they, in fact, knew that they were." The Supreme Court, however, has imposed no such materiality standard on plaintiff's attempted showings of pretext. Thus, the evidence offered by Ms. Parker is entitled to the full consideration of the trial court for the purpose of determining whether HUD's reasons for its actions were a pretext or whether they in fact deserved credence.

■ Equally insupportable is the district court's pronouncement that "[i]t is contrary to experience and common sense to expect that any of [the supervisors] would deliberately violate the law of the government in which they serve." If the court intended this proposition to serve as a legal presumption contributing to its analysis of whether Parker carried her burden of persuasion, it is reversible error. Moreover, the proposition can hardly withstand factual scrutiny. *See* "A System of Failure," *National Law Journal* 1 (April 24, 1989) (In 1987, 91 plaintiffs succeeded in discrimination claims against the federal government.).

Because the district court did not articulate the appropriate legal standards in this case, we are unable to discern whether it provided an acceptable basis for its decision. Consequently, we remand for further proceedings. In light of the district court's incorrect statements of law, we need not review the district court's remaining factual findings. We emphasize, however, that specific findings of fact are especially useful to a court reviewing the merits of a Title VII claim. This court would have benefitted from a more specific disposition of the allegations traceable to Mr. Dale. In addition, at least one of Parker's witnesses, Dorothy Norwood, may have been similarly situated to Parker for the purpose of attempting to demonstrate a discriminatory atmosphere at HUD. Norwood, a black female who took over Parker's position at HUD after Parker left, was also a GS–13 who was subsequently demoted to a GS–11, and was also the only person in the department to receive this treatment. Although neither Henderson nor Kirkendall were involved in demoting Norwood, her demotion may be relevant to establishing the existence of a discriminatory atmosphere, which in turn could serve as circumstantial evidence of individualized discrimination. *See Conway v. Electro Switch Corp.*, 825 F.2d 593, 596–98 (1st Cir.1987). The district court does not explain the basis for its conclusion that Nor-

wood and other witnesses testifying to impressions of discrimination were not "materially similarly situated." Again, more detailed findings of fact would have been useful in providing a clear basis for the court's reasoning.

III.

For the reasons outlined, we remand this case to the district court for further proceedings consistent with this opinion.

*It is so ordered.*