**Christine M. TOWNSEND, Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

**Civ. A. No. 89–1247 (CRR).**

United States District Court, District of Columbia.

Aug. 31, 1990.

Douglas B. Huron of Kator, Scott & Heller, Washington, D.C., for plaintiff.

James W. Morrison, Asst. Gen. Counsel, Robert J. Kniaz, Acting Deputy Gen. Counsel, Washington, D.C., for defendant.

## OPINION

CHARLES R. RICHEY, District Judge.

The plaintiff is suing the Washington Metropolitan Area Transit Authority ("WMATA") for intentional sex discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.* The plaintiff alleges that in 1984, instead of promoting her, WMATA appointed two males to the position of Curriculum Development Specialist ("CDS") and that WMATA subsequently retaliated against her for filing a complaint with the Equal Employment Opportunity Commission. At a bench trial, the plaintiff presented evidence to make out a *prima facie* case of sex discrimination, and WMATA put on evidence to show that it had legitimate, nondiscriminatory reasons for its refusal to promote her to a CDS position, which the plaintiff attacked as pretextual. Upon consideration of the evidence adduced at trial, the parties' oral and written arguments, and the underlying law, the Court holds that, while her retaliation claim must fail, the plaintiff has carried her ultimate burden of persuasion on the discrimination claim by showing that WMATA's proffered legitimate, nondiscriminatory reasons were mere pretexts for intentional discrimination.

### I. Findings of Fact

After receiving her B.S. degree from Ball State University in 1971, the plaintiff taught English to fourteen-to-eighteen-year-old students in the Prince William County, Virginia public school system until 1980. In the spring of 1982 the plaintiff taught Scholastic Aptitude Test preparatory classes at the Fairfax County Adult Education Center. In September 1982 the plaintiff began working in WMATA's Rail Service Department ("Rail Service") as a clerk-typist, and in April 1983 WMATA promoted her to the position of librarian (grade TA–12) in Rail Service's new technical library. As the first librarian, the plaintiff's responsibilities included setting up the new technical library, ordering reference materials, helping to administer tests to mechanics, and working with the Training Instructors in putting together their lesson plans.

In the spring of 1984, two new Curriculum Development Specialist ("CDS") positions (grade TA–18) became available in the Rail Training branch of Rail Service. WMATA's posting described the CDS position, in pertinent part, as follows:

DEFINITION OF CLASS:

This is employee training and development work involving curriculum development, instructional methodology and related training activities. A [CDS] is responsible for developing training courses for employees engaged in Metrorail operations and services including technical maintenance training ...; [CDS's] also train course instructors in instructional theory, principles and methods. *[CDS's] serve as members of a training team assigned responsibility for a functional training area....*

EXAMPLES OF DUTIES:

. . . . .

Develops criteria, standards and guidelines for rail service training programs. *Serves as a principal member of a course development team made up of a subject matter specialist, a training aids specialist and a [CDS]....*

. . . . .

KNOWLEDGE, SKILLS AND ABILITIES:

Considerable knowledge of curriculum development procedures and adult education programs, and training courses available.

. . . . .

Demonstrated ability to communicate effectively orally and in writing; *demonstrated ability to gain the confidence of rail service instructors....*

*Demonstrated ability to solicit useful feedback from rail service instructors*

and to respond to a need for curriculum changes based upon that feedback.

Pl. Exh. 1 (emphasis added). Moreover, Connie Williams, a WMATA witness and the plaintiff's supervisor in the Rail Training branch, testified on cross-examination that the CDS's were needed to put together courses for the instructors, who had the "hands on" technical expertise; that it was important for CDS's to have the instructors' confidence; and that CDS's would work on a team with instructors and not in isolation.

With advance warning from Thomas White, the head of Rail Training at that time, of the availability of the CDS positions, the plaintiff submitted her application after the openings were posted in April 1984. The plaintiff and another applicant named John Wilson were two of five internal (incumbent WMATA employee) candidates. WMATA concedes that the plaintiff received an "A" rating, the highest possible rating, from its personnel office; that she was deemed best qualified for the CDS position by a five-person rating panel chaired by a senior instructor, James Blake; and that the panel recommended to Thomas White that she be selected as a CDS. By contrast, Blake testified at trial that Wilson was not very impressive during the panel interview.

However, on April 30 or May 1, 1984, when White approached Fady Bassily, the head of Rail Service, to obtain his approval for a Personnel Action Report appointing the plaintiff to the CDS position, Bassily refused and told White that it was "premature" to make a final selection because applicants outside WMATA had not been considered yet. On May 1, 1984 the plaintiff met with Bassily to discuss his failure to approve her selection, at which point, as WMATA admits, Bassily told the plaintiff: "Regardless of what you may have been told, none of the CDS positions have been filled and no specific decision has been made at this time, with respect to the filling of the positions. The matter is still open." Def. Exh. 32.[1] But a WMATA document, signed by Bassily and his assistant William Randolph, demonstrates that on that same day, May 1, 1984, the plaintiff was "selected out"—eliminated from further consideration—because "another applicant with more technically related education and experience was selected." Def. Exh. 35; Pl. Exh. 24. Moreover, another WMATA document supports the plaintiff's claim that this "other applicant" was John Wilson and that—on or before May 1, 1990 —Bassily told White to evaluate Wilson's credentials and forward his name for selection, which White did. See Def. Exh. 34.

At Bassily's direction, White reconvened the rating panel chaired by James Blake to evaluate the applicants external to WMATA. After interviewing certain external candidates in the middle of May 1984, the panel designated as qualified for the CDS position and submitted to White several external candidates, in addition to the plaintiff as the sole internal candidate. See Def. Exh. 44. White in turn evaluated these "finalists" and forwarded to Bassily a list of five names that ranked, from most qualified to least qualified, four outside applicants and then the plaintiff. See Def. Exh. 46.

Still dissatisfied with White's handling of the CDS selection process, Bassily created his own rating panel consisting of himself as chairman, his assistant Randolph, and Sharon McSwain, an employee from WMATA's Personnel Office. WMATA's own witness Michael Staed—the Personnel Office employee responsible for Rail Service at that time—testified on cross-examination that he could not understand why McSwain was on the rating panel, since she did not usually work with Rail Service. The Bassily Panel interviewed John Wilson—the internal candidate who had been rated lower than the plaintiff by the Blake Panel—and

---

**1.** During that same meeting, Bassily expressed doubts about the plaintiff's "technical English ability" and asked her various specific questions about how she would go about developing a curriculum for a given WMATA technical train-

various external candidates,[2] but did not interview the plaintiff. On June 1, 1984 the Bassily Panel recommended Wilson for one CDS vacancy, Def. Exh. 55, and on June 5, 1984 Bassily officially selected Wilson for the CDS position, Def. Exh. 48. At the same time, Bassily "froze" the second CDS vacancy and assigned it on a "temporary basis" to Michael Lamb, a WMATA employee who had not gone through the CDS application process and for whom the CDS position was a demotion. *Id.* Thus, whatever the reason for Bassily's decision to select Lamb for the second CDS vacancy,[3] its ultimate effect was to frustrate the plaintiff's efforts at securing a CDS position.

Staed, WMATA's Personnel Office employee, testified that the interview was a very important part of the applicant screening process at WMATA. This is significant because Bassily claimed at trial that his panel did not interview the plaintiff after the entire panel reviewed her qualifications on paper and collectively decided that she did not warrant an interview. However, Randolph, Bassily's assistant and a member of the rating panel, specifically contradicted Bassily, testifying that Bassily did not discuss the plaintiff's application with him and that *Bassily alone* decided the plaintiff was not qualified. Moreover, WMATA claims that the plaintiff received

what was, in effect, an interview when Bassily asked the plaintiff some questions concerning curriculum development and evaluated her during their May 1, 1984 meeting. *See supra* note 1. But this contention makes no sense. There is no indication that the cursory questions Bassily asked in his May 1 meeting with the plaintiff were even remotely similar to the questions that the Bassily Panel posed when interviewing the other candidates or that his individual evaluation of the plaintiff was equivalent or comparable to the panel's collective evaluation of the other candidates.

Nor can the Court, due to the state of this record, adequately compare the qualifications of the various candidates for the CDS positions. While WMATA submitted voluminous exhibits concerning other issues, on the qualifications issue it relied almost exclusively on the testimony of Bassily and failed to place in the record: (1) any documentation concerning the crucial interviews that the Bassily Panel conducted; (2) any evidence of Lamb's qualifications; and (3) any evidence—considered at that time—of Wilson's qualifications, other than one document containing on one half of one page Wilson's hand-written description of his experience and qualifications, *see* Def. Exh. 24.[4]

---

ing course on her own "without the luxury of the team approach." Def.Exh. 32.

**2.** The plaintiff claims that all of the external candidates interviewed were men, but WMATA denies this allegation. However, while WMATA submitted over one hundred exhibits, it did not come forward with a list of those persons interviewed by the Bassily Panel.

**3.** Bassily testified at trial that WMATA assigned Lamb to the second CDS position on a temporary basis for "humanitarian reasons" because he had requested the transfer/demotion to enable him to resolve his serious personal problems. On the other hand, the plaintiff testified that Lamb had told her:

that he was given no choice, that Mr. Bassily called him in and asked him why he hadn't applied for the [CDS] position, and he said he had no desire for that position. He didn't consider applying, and Mr. Bassily told him that he had better consider it because his other job was not going to be his after this

and that he had that choice and only that choice.

Trial Transcript at 1–44. Furthermore, although Lamb's appointment to the CDS position was supposedly only for a temporary, six-month period, he occupied that position for fifteen months, and there was no definite time limit on his appointment.

**4.** To make matters worse, in its post-trial proposed findings and arguments, WMATA denigrates the plaintiff's technical background by quoting at great length from her deposition transcript. However, because this deposition was never received in evidence at trial, it plays no part in the Court's decision. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254–55 & n. 9, 101 S.Ct. 1089, 1094 & n. 9, 67 L.Ed.2d 207 (1981) (to satisfy its intermediate burden of rebutting the presumption of discrimination, the employer "must clearly set forth, *through the introduction of admissible evidence,* the reasons for the plaintiff's rejection"; "[a]n articulation not admitted into evidence will not suffice" (emphasis added)); *see also Lanphear*

However, the Court notes that subsequent events—while not dispositive—are certainly relevant and do not reflect favorably on WMATA's selections for the CDS vacancies. Wilson occupied his CDS position for only about two months, and, as his supervisor Connie Williams testified, she asked him to leave because he could not do the job. Although Lamb, the "temporary" selectee, remained longer than the "permanent" selectee Wilson, Williams also testified that Lamb never completed developing a single course. Moreover, according to the testimony of James Blake, a senior instructor in Rail Training, neither Wilson nor Lamb were any help to the instructors in developing curricula.[5] The subsequent selection in 1985 of Kathy Regiec, who had a banking background and absolutely no technical experience, see Def. Exh. 74, further undercuts Bassily's testimony that "hands on" technical experience with WMATA's transportation systems was a prerequisite for the CDS position. In any event, by 1985 WMATA apparently considered the plaintiff sufficiently qualified for certain CDS jobs because, as both the plaintiff and Williams (her supervisor) testified, Williams assigned some of Regiec's CDS projects to the plaintiff. See Trial Transcript at 1–45–1–47; Plaintiff's Trial Decl. ¶ 14; William's Revised Trial Decl. ¶ 25.

Another relevant issue is the general discriminatory atmosphere at WMATA in 1984 when the plaintiff first applied for a CDS position (grade TA–18). At that time, as WMATA concedes, women occupied only five percent of the upper-level positions (grades higher than TA–12) in Rail Service. Furthermore, Claude Swanson, Director of WMATA's Office of Civil Rights, testified that WMATA had no top women managers in 1984 and that the many improvements at WMATA—workshops with managers and progress in hiring and promoting women—all occurred after the summer of 1984. Finally, an internal survey conducted by the Office of Civil Rights around April 1984 revealed that most female WMATA employees felt they were qualified for promotions but were not being promoted and that a common problem was that "[m]ale managers [did] not want women in professional positions." See Pl. Exh. 7.

After she was passed over for the two CDS vacancies in 1984, the plaintiff filed an internal grievance, which WMATA denied. Then, in December 1984 the plaintiff filed an EEOC complaint, which the Alexandria Office of Human Rights ("AOHR") investigated. It is undisputed that WMATA was aware of the plaintiff's EEOC complaint and that it cooperated fully with the AOHR's investigation. In addition, in September 1985, WMATA's EEO officer called the plaintiff in for a meeting to "check up on her."[6]

Later in 1985, after WMATA reassigned Wilson and Lamb, the plaintiff again applied for the two CDS vacancies. WMATA denied her application, instead selecting Kathy Regiec and Kathleen Miller for the CDS positions. With WMATA's encouragement and financial backing, Miller and the plaintiff both attended and graduated

---

v. Prokop, 703 F.2d 1311, 1317 (D.C.Cir.1983) (quoting Burdine). Similarly, WMATA's repeated reliance upon various parts of Bassily's deposition and other depositions is misplaced because they also were never received in evidence.

5. WMATA's position throughout these proceedings has been to strenuously deny that it asked Wilson and Lamb to relinquish their CDS positions because they could not do the job. See, e.g., Defendant's Opposition to Plaintiff's Proposed Findings of Fact at 16, 18. This position is puzzling to the Court—and does not reflect favorably on the credibility of WMATA's other contentions and arguments—because buried in one of WMATA's many exhibits is an admission by Bassily that "when the performance of the two selected male applicants [Wilson and Lamb] proved to be contrary to the representation made through the selection process and their accredited experience and academic education[,] both were placed, with mutual understanding, in other less critical positions within [WMATA]." Def.Exh. 76 at 2.

6. Having examined all of the evidence on this issue, the Court comes to the equivocal conclusion that the reason for the meeting is subject to two entirely different interpretations: that it was meant as a threat, as the plaintiff claims, or that the meeting was called, as WMATA contends, for the benign purpose of determining the precise nature of the plaintiff's complaints and ascertaining how the problems could be resolved.

from a nine-month certificate program in curriculum development at Georgetown University. As a result of the plaintiff's taking this course, WMATA reclassified and upgraded her position from Librarian (TA–12) to Training Assistant (TA–14).

In the spring of 1987, after Miller and Regiec had left, WMATA again posted the two CDS vacancies. The plaintiff again applied unsuccessfully as WMATA, in accordance with a rating panel's recommendations, selected Carolyn Saba and Daniel Johnson. Finally, later in 1987, as a result of a WMATA-wide reduction-in-force, WMATA reassigned the plaintiff from Rail Service to another WMATA department, where she presently works as a Consumer Representative at the same grade level as her last position in Rail Service. Throughout the period following her 1984 rejection until the present, the plaintiff has received regular within-grade "step" pay increases and favorable evaluations.

## II. Conclusions of Law

### A. Intentional Discrimination

Today the Court reaffirms its trial ruling that the plaintiff has met her burden of making out a *prima facie* case of intentional discrimination in violation of Title VII. As required by *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–54 & n. 6, 101 S.Ct. 1089, 1093–94 & n. 6, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the plaintiff has shown that: (1) as a woman she is a member of a protected class; (2) she was qualified for and applied for an available CDS position; (3) WMATA rejected her application; and (4) it filled the CDS vacancies by selecting two men. *See also Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir.1981).

In turn, WMATA has responded to the shift in the burden of production, *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094, by proffering legitimate, nondiscriminatory reasons for the plaintiff's rejection. WMATA contends, and has introduced some admissible evidence in an attempt to show, that it did not award the plaintiff a CDS position because the "permanent" selectee (Wilson) was more qualified than the plaintiff and because, for "humanitarian" reasons, it had to assign the second CDS position on a "temporary" basis to a troubled employee (Lamb), who in any event was also more qualified than the plaintiff. By advancing this explanation for its decision, WMATA has succeeded in "sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Id.* at 254 n. 8, 101 S.Ct. at 1094 n. 8.

At this third stage, the plaintiff has the opportunity to satisfy her ultimate burden of persuading the Court that she was the victim of intentional discrimination by demonstrating that WMATA's proffered reasons were not the true reasons for its failure to offer her one of the available CDS positions in 1984. *See id.* at 256, 101 S.Ct. at 1095. "In short, the ... [C]ourt [now] must decide which party's explanation of the employer's motivation it believes." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

Moreover, this Circuit has recognized that in employment discrimination actions "[e]mployees and applicants for employment have great informational disadvantages: they cannot reach into the minds of decisionmakers, and therefore they usually can gather only circumstantial evidence of discriminatory motives." *Krodel v. Young*, 748 F.2d 701, 707 (D.C.Cir.1984) (quoting *Cuddy v. Carmen*, 694 F.2d 853, 859 (D.C.Cir.1982)), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985). The Supreme Court also has acknowledged the importance of circumstantial evidence, noting: "All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult.... *There will seldom be 'eyewitness' testimony as to the employer's mental processes.*" *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482 (emphasis added). Therefore, "[i]t matters not that the plaintiff's vehicle of proof was indirect, rather than direct evidence." *King v. Palmer*, 778 F.2d 878, 881 (D.C.Cir.1985). In sum, in demonstrating that she was a victim of

intentional discrimination, the plaintiff may succeed "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

■ The Court holds that this record contains so many unexplained inconsistencies, irregularities, and holes that the Court simply cannot believe WMATA's proffered legitimate, nondiscriminatory reasons. *See, e.g., King*, 778 F.2d at 881 ("*Burdine* makes it absolutely clear that a plaintiff who establishes a *prima facie* case of intentional discrimination and who discredits the defendants' rebuttal should prevail, even if he or she has offered no direct evidence of discrimination."); *Lanphear v. Prokop*, 703 F.2d 1311, 1317 (D.C.Cir.1983) ("If ... [the plaintiff] shows [the defendant's proffered legitimate, nondiscriminatory] reason to be specious, then in conjunction with his prima facie case [the plaintiff] has carried his burden of proving discrimination by a preponderance of the evidence."). Although each one of these flaws may be too small—in and of itself—to discredit WMATA's reasons for not promoting the plaintiff, when the cracks appear together at the same time the dam of WMATA's explanations bursts and the water drowns out WMATA's protestations.

Despite the Court's inability, on this record, to conduct an adequate comparison of the CDS applicants' qualifications and determine who the best-qualified candidates were, *see supra* text preceding note 4, the Court nevertheless holds for the plaintiff because she has demonstrated by a preponderance of the evidence that WMATA improperly and prematurely eliminated her from consideration for the CDS vacancies. The piece of evidence that comes closest to being the so-called "smoking gun" in this case is one of WMATA's own documents, the Applicant Appraisal Record ("AAR") for the plaintiff dated May 1, 1984 that reflects WMATA's rejection of her application. Def.Exh. 35; Pl. Exh. 24. The most significant aspect of this document is the May 1, 1984 date because on that same day Bassily informed the plaintiff that the CDS positions had not been filled and indicated that she was still a viable candidate. The self-serving testimony of Bassily and Randolph, whose signatures appear on the AAR, that the May 1 date must be wrong is insufficient to counter the force of the black-on-white evidentiary support for the plaintiff's claim that she was secretly "selected out" about one month before WMATA officially announced its selection of Wilson and Lamb for the two CDS positions. The May 1, 1984 AAR is also significant because, by indicating that another more qualified applicant was selected, it lends credence to the plaintiff's claim that Bassily "pre-selected" Wilson before he had even seen his application materials and before the Bassily Panel had interviewed Wilson and some of the external candidates.

Nor does the work of Bassily's rating panel help buttress WMATA's crumbling defense. First, as the panel chairman, Bassily hand-picked the other two members, choosing his personal assistant William Randolph and inexplicably Sharon McSwain, an employee in WMATA's Personnel Office who did not work with Rail Service.[7] Consequently, it is not surprising that Bassily exercised great control over the panel's work. For example, as Randolph testified, the panel never reviewed the plaintiff's application materials, and Bassily himself decided that the panel would not interview the plaintiff. Thus,

---

**7.** The composition of the Bassily panel was curious to say the least. A CDS was expected to work closely with WMATA's training instructors in developing courses, and indeed one of the skills required by the CDS job specification was "demonstrated ability to gain the confidence of rail service instructors." Def.Exh. 20. Despite the obvious importance of instructors to the evaluation process, both in terms of their "hands on" technical knowledge and their assessment of the candidates' ability to gain their confidence, Bassily failed to select even one instructor for his panel. In choosing the members for his panel, Bassily was aware that the Blake Panel, consisting of five instructors, had already given the plaintiff its highest rating and had recommended the plaintiff—and not Bassily's preferred candidate Wilson—as most qualified for the CDS position.

Bassily effectively eliminated the plaintiff, despite the top ratings she received from WMATA's Personnel Office and from the earlier Blake Panel that consisted of five instructors who would work closely with a CDS.

Moreover, although WMATA introduced over one hundred exhibits into evidence, it failed to produce evidence—which would be in WMATA's control if it existed—to document: (1) what procedures, if any, the Bassily Panel followed; (2) which candidates other than Wilson appeared before the panel; or (3) how the panel evaluated Wilson and the various external candidates. "It is a familiar rule of evidence that a party having control of information bearing upon a disputed issue may be given the burden of bringing it forward and suffering an adverse inference from failure to do so." *Alabama Power Co. v. Federal Power Comm'n,* 511 F.2d 383, 391 n. 14 (D.C. Cir.1974); *see also International Union, UAW v. NLRB,* 459 F.2d 1329, 1336 (D.C. Cir.1972) ("when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him"). In sum, this record contains almost no evidence to counter the plaintiff's charge, amply supported by the circumstantial evidence discussed above, that the Bassily-dominated panel merely "rubberstamped" Bassily's earlier selection of Wilson at the plaintiff's expense.

Similarly unconvincing is Bassily's explanation that the plaintiff was not qualified for the CDS position because she did not have the "hands on" technical knowledge to develop curricula *on her own.* Contrary to Bassily's testimony, the specifications for the CDS position repeatedly said that a CDS would work *as part of a team* and explicitly stated that the team would consist of "a subject matter specialist, a training aids specialist and a [CDS]." Def.Exh. 20. The testimony of Connie Williams, the supervisor of WMATA's Rail Training branch, to the effect that CDS's were expected to work on a team with instructors who had the "hands on" technical experience further exposes the pretextual nature of Bassily's insistence that the plaintiff

would not have "the luxury of the team approach." Def.Exh. 32. Bassily's "isolationist" view of the CDS position also cannot be reconciled with WMATA's subsequent decision to hire Kathy Regiec—an applicant external to WMATA with even less "hands on" technical experience than the plaintiff—to fill a CDS vacancy in 1985.

In carefully examining an employer's proffered legitimate, nondiscriminatory reasons for failing to promote a Title VII plaintiff, the Court must consider the decision within the context of the employer's general attitude towards members of the plaintiff's protected class. Courts have recognized that "a discriminatory atmosphere [at a plaintiff's place of employment] ... could serve as circumstantial evidence of individualized discrimination." *Parker v. Secretary, United States Dep't of Housing and Urban Dev.,* 891 F.2d 316, 322 (D.C.Cir.1989); *see also Conway v. Electro Switch Corp.,* 825 F.2d 593, 597 (1st Cir.1987) ("While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff."). Furthermore, although statistical evidence is more significant in disparate impact or class action disparate treatment cases, "statistical evidence is certainly *relevant* to a showing of pretext in [individual] disparate treatment actions." *Krodel v. Young,* 748 F.2d 701, 710 (D.C. Cir.1984) (emphasis in original) (citing *McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985); *see also Cook v. Boorstin,* 763 F.2d 1462, 1468–69 (D.C.Cir.1985) ("It strikes us as altogether obvious that statistical (or anecdotal) evidence that the [defendant] discriminated against its black librarians would be *relevant* to whether the [defendant] discriminated against its black attorneys." (emphasis in original)).

The discriminatory atmosphere at WMATA through the summer of 1984, when the plaintiff's CDS application was rejected,

further erodes the credibility of WMATA's proffered legitimate, nondiscriminatory reasons. WMATA admits that around the same time that the plaintiff sought to advance within Rail Service from her grade TA–12 Librarian job to a grade TA–18 CDS position, women in that department occupied only five percent of the positions higher than TA–12. Moreover, the Director of WMATA's Office of Civil Rights testified that WMATA had no top women managers in 1984, and women employees' responses to an internal WMATA-wide survey indicated that, though qualified, their prospects for advancement were bleak.[8]

Under these circumstances, the plaintiff has shown by a preponderance of the evidence that, *at the time of the selection process,* WMATA did not fairly and objectively compare the plaintiff's qualifications for the CDS position with those of Wilson and Lamb. In other words, by demonstrating that WMATA prevented her from competing for the CDS positions on a level playing field with the male selectees, the plaintiff has exposed the pretextual nature of WMATA's reliance on Wilson's and Lamb's purportedly superior qualifications.[9] Because WMATA never engaged in that kind of analysis at the time, WMATA's insistence that a careful weighing of the applicants' qualifications would prove that its failure to promote the plaintiff was nondiscriminatory is merely a *post hoc* rationalization that "carries the seeds of its own destruction." *Bishopp v. District of Columbia,* 788 F.2d 781, 789 (D.C.Cir.1986); *cf. Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989) (in mixed-motives case, employer may not proffer as a legitimate, nondiscriminatory reason a reason that "did not motivate it at the time of the decision").

8. WMATA may be justifiably proud of the progress it has made in hiring and promoting women (as Claude Swanson testified) and understandably emphasizes that Bassily appointed three women to CDS positions and twice won the General Manager's Award in Equal Employment Opportunity. However, these achievements are irrelevant because they all occurred *after* WMATA first refused the plaintiff's application in 1984. *See Bishopp v. District of Columbia,* 788 F.2d 781, 788 & n. 10 (D.C.Cir.1986) ("if the [defendant's] motivation in promoting Lewis [instead of the plaintiff] was based on racial preference it matters not if subsequent appointments were made without discriminatory motivation" (citing *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 346 & n. 11 (10th Cir.1975); *Parham v. Southwestern Bell Tel. Co.,* 433 F.2d 421, 425 (8th Cir.1970))). Swanson testified that, *after* the summer of 1984, WMATA responded to the unfavorable survey results by holding workshops with managers to improve employment opportunities for women. Similarly, the plaintiff's rejection preceded Bassily's accomplishments in that he won the two awards mentioned above in 1985 and 1986. Finally, he selected women for the CDS position only after it became clear that the two men he had initially selected needed to be replaced for their inability to do the job.

9. In any event, the Court is not convinced by WMATA's overly effusive praise for the qualifications of the two men selected instead of the plaintiff. For example, although WMATA has desperately attempted to divert scrutiny from Lamb's selection by arguing that he was only a "temporary" selectee, he occupied the second CDS position for fifteen months and never completed developing a single course. On this record, the Court holds that WMATA's explanation for Lamb's selection is not worthy of credence; it is heavily reliant on "humanitarian reasons" and "temporary assignment" themes but conspicuously short on support. Although the evidence—if it existed—would be in WMATA's control, WMATA has failed to document Lamb's qualifications. *See Alabama Power Co.,* 511 F.2d at 391 n. 14 (party's failure to produce relevant evidence within its control gives rise to adverse inference); *International Union, UAW,* 459 F.2d at 1336 (same). As for the qualifications of the "permanent" selectee Wilson, he apparently had some technical experience but little teaching experience, *see* Def.Exh. 76 (Wilson resume attached), especially compared to the plaintiff's ten years of teaching experience. Moreover, after only about two months WMATA reassigned Wilson to another position because he could not do the CDS job and—like Lamb—was of no help to the instructors.

On the other hand, while nobody will ever know for certain how the plaintiff would have performed in Wilson's or Lamb's place, by 1985 her supervisor had sufficient confidence in her curriculum development capabilities to reassign some of Kathy Regiec's CDS work to the plaintiff. WMATA makes too much of the plaintiff's candid testimony at trial that she did not "have the same background qualifications that [Wilson] had." Trial Transcript at 1–43. As discussed previously, the CDS candidates' qualifications on paper were not dispositive, and their interview performances and personalities played important roles in the application process.

## B.  Retaliation

■ Although the Court holds that the plaintiff has carried her burden on the discrimination claim based on WMATA's failure to promote her in 1984, she has failed to convince the Court that WMATA subsequently retaliated against her for filing an EEOC grievance.[10]  The plaintiff alleges that WMATA retaliated against her in four different ways by rejecting her 1985 and 1987 CDS applications, calling her into a "threatening" meeting to "check up" on her, and finally eliminating her position in Rail Service during a WMATA-wide reduction-in-force ("RIF").

It is well-established that "in order to establish a prima facie case of retaliation, a plaintiff must show: 1) that she engaged in a statutorily protected activity;  2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two."  *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985) (quoting *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C. Cir.1984)).  A plaintiff may establish the "causal connection" element "by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  *Id.*  In a case involving a retaliatory failure to promote, the plaintiff must also demonstrate that he or she was qualified for the position.  *Id.* at 86 n. 5 (citing *Williams v. Boorstin,* 663 F.2d 109, 116–17 (D.C.Cir.1980, *cert. denied,* 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 842 (1981)).

Even assuming *arguendo* that the plaintiff has made out a *prima facie* case of retaliation, the Court holds that she did not satisfy her burden of proving by a preponderance of the evidence that WMATA's proffered legitimate, nondiscriminatory reasons are pretextual.  *See id.* at 87.  WMATA has explained that the applicants selected for the 1985 and 1987 CDS vacancies were more qualified than the plaintiff, and the plaintiff has not introduced evidence of flaws, inconsistencies, or procedural irregularities in the selection process sufficient to expose these explanations as pretexts for retaliation.  Similarly, the plaintiff's evidence supporting the allegedly threatening nature of her fall 1985 meeting with WMATA's EEO officer Joan Lewis is inconclusive at best and is certainly not sufficient to rebut WMATA's plausible explanation that it called the meeting to learn the specific nature of the plaintiff's complaints and determine how best to arrive at a satisfactory resolution.[11]  Nor has the plaintiff demonstrated that WMATA used the WMATA-wide RIF as a pretext for retaliating against her by eliminating her position in Rail Service.  Not only did this RIF occur well over two years after the plaintiff filed her EEO complaint—not *shortly after* the protected activity as *Mitchell,* 759 F.2d at 86, requires—but it came after WMATA: (1) had cooperated fully with the AOHR's formal investigative requests; (2) had paid for the plaintiff to take a curriculum development course at Georgetown University; (3) had

---

**10.**  The plaintiff devoted much less energy to arguing and presenting evidence on her retaliation claim than on her discrimination claim. Thus, it is not surprising that, as plaintiff's counsel stated at trial, the gravamen of her complaint is intentional discrimination.  In light of the Court's ruling on her discrimination claim, its denial of the plaintiff's retaliation claim, as a practical matter, is relatively unimportant to her because in terms of relief "many aspects of the retaliation allegation are mooted if [the plaintiff] prevails on her claim of discrimination concerning the 1984 CDS openings."  Plaintiff's Post–Trial Reply at 6.  Thus, although the remedies in this case do not include injunctive relief at this time, the Court is confident that WMATA will not compound its problems by retaliating against the plaintiff for the Court's findings and holdings announced herein.

**11.**  The Court cannot fault WMATA's EEO Office for doing what Congress intended in enacting Title VII, namely attempting to address and resolve the plaintiff's discrimination complaint through less formal and polarizing means than litigation.  *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101 n. 14, 101 S.Ct. 2193, 2200 n. 14, 68 L.Ed.2d 693 (1981) ("In Title VII, Congress expressed a preference for voluntary settlements of disputes through the conciliation process." (citing *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974))); *cf. McRae v. Librarian of Congress,* 843 F.2d 1494, 1496 (D.C.Cir.1988) (per curiam) ("the exhaustion requirement is intended to give the agency the opportunity to right any wrong it may have committed").

upgraded her position from Librarian (TA–12) to Training Assistant (TA–14); and (4) had consistently given her within-grade step increases and favorable evaluations.

### III. Conclusion

■ Although the plaintiff fails on her retaliation claim, she has succeeded in proving by a preponderance of the evidence that WMATA's proffered legitimate, non-discriminatory reasons for selecting two males for the 1984 CDS vacancies instead of promoting her actually were mere pretexts for intentional sex discrimination in violation of Title VII. Having established WMATA's liability for discrimination in 1984, the plaintiff is entitled to complete relief: (1) a promotion to TA–18 retroactive to June 11, 1984, see Pl.Exh. 6, and to the next CDS opening, with full back pay and all step increases and other accumulated benefits that she would have received; (2) prejudgment interest on her back pay, see Loeffler v. Frank, 486 U.S. 549, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988); and (3) attorneys' fees and costs. As per their representations made at trial, counsel for the plaintiff and for WMATA shall confer to calculate and agree upon the precise amount to which the plaintiff is entitled consistent with the Court's rulings.

The Court will issue an Order of even date herewith in accordance with the foregoing Opinion.

### ORDER

In accordance with the Court's Opinion of even date herewith, it is, by the Court, this 30th day of August, 1990,

ORDERED that final judgment in the above-captioned case shall be, and hereby is, entered for the plaintiff on her discrimination claim; and it is

FURTHER ORDERED that the defendant shall promote the plaintiff to the grade of TA–18 retroactive to June 11, 1984 and shall select her for the next Curriculum Development Specialist position that becomes available; and it is

FURTHER ORDERED that counsel for both parties shall confer to calculate and agree upon the precise amount of back pay (including step increases and any other accumulated benefits that the plaintiff would have received if she had been promoted in 1984), prejudgment interest on her back pay, and attorneys' fees and costs to which the plaintiff is entitled consistent with the Court's Opinion and Order and, within forty-five (45) days of the date of this Order, counsel shall jointly inform the Court in writing of the result of their calculations; and it is

FURTHER ORDERED that final judgment shall be, and hereby is, entered for the defendant on the plaintiff's retaliation claim; and it is

FURTHER ORDERED that, in view of the foregoing, this case stands DISMISSED from the Court's docket; however, the Court will retain jurisdiction for the limited purpose of awarding attorneys' fees and costs, if any, and calculating the precise amount of the plaintiff's award should the parties be unable to agree thereon as ordered herein.