**Judy J. JONES, Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

Civil Action No. 89–0552(RCL).

United States District Court,
District of Columbia.

Oct. 15, 1996.

Richard A. Salzman, Kator, Scott & Heller, Washington, DC, for plaintiff.

Robert John Kniaz, Frederic Howard Schuster, Bruce Paul Heppen, Gerard Joseph Stief, Arnold Irvine Melnick, David R. Keyser, WMATA, Office of the General Counsel, James William Morrison, Arter & Hadden, Linda Iris Lazarus, Office of Corporation Counsel, Washington, DC, for defendant.

### MEMORANDUM OPINION II

LAMBERTH, District Judge.

The court today issues this Memorandum Opinion II and accompanying order covering non-jury issues tried before the court. Separately issued this date is Order and Memorandum Opinion I, which sets the background of this litigation and addresses several motions by defendant Washington Metropolitan Area Transit Authority (WMATA), including its motion for judgment as a matter of law or, in the alternative, for a new trial.

Because the unlawful acts alleged in this case predate the Civil Rights Act of 1991, the court rather than the jury must decide Jones' Title VII claims. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128

L.Ed.2d 229 (1994). The court must also decide issues of relief under both Title VII and the Age Discrimination in Employment Act (ADEA), including attorneys' fees, the amount of back pay owed Jones, and the amount of liquidated damages due her under the ADEA given the jury's determination that the ADEA violations were willful, 29 U.S.C. § 626(b). Finally, the court must decide the nature of any injunctive relief, such as promotion and reinstatement, as well as Jones' request that WMATA and its assistant general manager in charge of rail, Fady Bassily, be enjoined from further retaliation against her or other WMATA employees who engage in protected activity.

Plaintiff Judy Jones asks that the court find that WMATA retaliated against her in violation of Title VII when she was denied promotion to TS–4 in 1987 and 1988, and when she was terminated in March 1991, and that WMATA subjected her to sex discrimination in violation of Title VII when she was rejected for promotion to TS–5 in 1987. Based upon the following findings of fact and conclusions of law, the court holds that WMATA violated Title VII by denying Jones' promotion to TS–4 in 1987 and again in 1988, and by terminating Jones in 1991. The court rejects Jones' claims in respect of the TS–5 promotion in 1987.

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

*A. Controlling Law*

1. WMATA is an employer as defined by both the ADEA, 29 U.S.C. §§ 621 *et seq.*, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

2. Title VII makes it unlawful for an employer to discriminate against one of its employees on the basis of sex or to retaliate against one of its employees for complaining about sex discrimination or for pursuing a claim of sex discrimination. Under Title VII, such complaints are considered protected activity. 42 U.S.C. § 2000e–3(a).

3. The burden of establishing a prima facie case of sex discrimination in violation of Title VII can be satisfied by showing that (1) the plaintiff applied for the job, (2) she was qualified for it, (3) she was not selected, and (4) a man was. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

4. The burden of establishing a prima facie case of retaliation in violation of Title VII can be satisfied by showing that (1) the plaintiff engaged in activity protected by the Act, (2) the plaintiff was subject to an adverse employment action, and (3) there exists a causal connection between the two. *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984). The third element may be satisfied by showing that the employer was aware of the protected expressions at the time of the adverse employment action, and that the adverse action took place shortly after the protected activity, *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985).

5. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory explanation for its actions. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.

6. The burden then passes back to the plaintiff to prove, by a preponderance of the evidence, that sex discrimination or unlawful retaliation more likely than not motivated the employer's actions. *Id.* Plaintiff need not present direct evidence. If she demonstrates that the employer's articulated explanations are unworthy of credence, the finder of fact may, but is not required to, infer that the reason is pretextual and that sex discrimination or retaliation is the real reason. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993).

7. Where there is direct evidence of sex discrimination or retaliation, the *McDonnell Douglas/Burdine* circumstantial proof scheme, including the prima facie analysis set forth above, need not be applied, and the issue narrows to whether plaintiff has proven by a preponderance of the evidence that retaliation more likely than not motivated the adverse action. *Trans World Airlines, Inc.*

*v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985).

### B. Background

8. Jones had served as a first line supervisor (TS–3) in the Rail Department since 1984, having begun her career at WMATA as a bus driver in 1974 and having later served as a Train Operator. At the time of trial, she was 69. Jones has openly protested what she perceived as discrimination in the Rail department, using both formal and informal means to present her views.

9. Jones engaged in protected activity under Title VII by protesting sex and race discrimination on five separate occasions: (1) when she and four other women sent a letter to Fady Bassily in 1985 protesting discrimination, (2) when she filed an earlier Title VII lawsuit against WMATA that settled in February 1987, (3) when she filed a charge with the Equal Employment Opportunity Commission (EEOC) that is the basis for this suit in September 1987, (4) when she filed this lawsuit in March 1989, and (5) when she retained new counsel to prosecute this suit in February 1991.

10. In assessing Jones' claims, the court relies in part upon "third party" evidence of retaliation at WMATA. In this regard, the court credits the testimony of Avon Mackel, Joan Lewis, and Glennard Hodges.

11. Avon Mackel is a senior manager who has worked at WMATA for 10 years. In 1990, following a reorganization, Mackel served in the Rail Department and filed a charge of discrimination with the EEOC.

12. Bassily's response was to inform Mackel that he did not like his managers filing discrimination complaints. Bassily said that a reduction-in-force was on the horizon, and he made it clear that if Mackel pressed his EEO complaint he would be RIFfed. Mackel refused to drop his complaint, and two months later he was RIFfed.

13. Joan Lewis, a former EEO officer at WMATA, confirmed that Bassily resented discrimination complaints, often reacting angrily when one was filed. She also testified that Claude Swanson, WMATA's Director of Civil Rights, ordered her to report all complaints of discrimination—informal as well as formal—to Carmen Thorne, one of Bassily's assistants. No department other than Rail had ever sought such information and its disclosure could compromise the anonymity of some informal complaints. Lewis declined to honor Swanson's directive but later learned that someone else in Civil Rights was providing the information to the Rail department.

14. Glennard Hodges was an Assistant Superintendent, TS–7, when he helped form an association of rail supervisors in 1992. He was later demoted to TS–3. Hodges testified that, in his view, Bassily retaliated against Judy Jones when he fired her in 1991.

15. Taken as a whole, the testimony of Mackel, Lewis, and Hodges suggests that Fady Bassily engaged in retaliation against those who complained of discrimination in the Rail department. It is against this backdrop of retaliation that Judy Jones' claims must be assessed.

### C. Jones' Qualifications

16. According to WMATA official Mark Miller, Judy Jones was one of the better applicants for the first level position of Rail Supervisor, TS–3, when she secured that job in 1984. She has never been promoted above that level.

17. When applying for promotion, Jones received high marks on criteria such as job knowledge, communications skills, education and training; but she was denied promotions, allegedly because of poor ratings on other criteria—most particularly, attitude. Nonetheless, referring to the 1986–87 time frame, Jones' supervisor said that she "[a]ccepts assignments with a positive attitude" and generally "suggests innovative solutions to work problems."

18. For 1987–88, another supervisor said that Jones "[r]outinely follows authority policies, rules, regulations" and that she "looks for constructive solutions" to work problems. For 1988–89, a third supervisor reported that "Jones willingly helps co-workers and routinely follows Authority's Policies, Rules and Regulations." And for 1989–90—the evaluation period that ended just a few months

before her termination—Jones' supervisor said that "Jones has a good attitude and willingly shares knowledge and information to help others on her shift. She cooperates with the other departments with which she interfaces during her working hours."

19. Upon occasion, supervisors prepare special ratings to assist in making promotional decisions. In 1988—when Jones was denied a TS–4 position—she received a higher special supervisory rating than several of the candidates who were chosen. And in 1989, Jones' supervisor stated:

Jones has no problems with her leadership abilities. She knows what has to be accomplished during her tour of duty and uses every means at her disposal to do so.

. . . .

Supervisor Jones does show sound judgment. . . . [S]he has . . . never had a problem which she could not handle herself. She is self sufficient.

Her knowledge of rules and regulations is very thorough and she can produce quality work without supervision.

20. Jackie Rhodes, a subordinate of Jones' employed by WMATA as a train operator, testified credibly that Jones is one of the finest supervisors she has had; Jones is precise in her directives to her staff, treats subordinates well, and never orders someone to do something that she will not do herself.

### D. Denial of Promotion to TS–4 in 1987

21. In 1985, about a year after she became a TS–3 supervisor, Jones and four other women (all Train Operators serving under her) sent a short letter to Fady Bassily protesting what they believed was discrimination against white women in the Rail department. Mark Miller, who was head of Rail Transportation at the time, acknowledged at trial that the letter was polite. Bassily directed Miller to take care of the situation.

22. At that point Miller and John Kirin (then the third ranking person in Rail but soon to shift positions with Miller) subjected Jones to an aggressive interview during which he ordered her never to send another such letter to Bassily and told her that if she did not like the situation at WMATA she should resign as a supervisor.

23. In 1986 Rail management sought to upgrade all first line supervisors one pay level—to TS–4—but was able to secure authorization only to upgrade some 40 percent of the 80–90 TS–3's, or about 32–36. The first batch of TS–4 upgrades occurred in 1986; the second batch was slated for 1987.

24. Joseph Taylor was appointed to head a screening panel which in 1987 recommended 14 candidates to be considered for promotion to TS–4, including Judy Jones. Bassily said that he fostered the use of screening panels to address abuses in the promotion process. Nonetheless, Kirin (then the second ranking person in Rail, having traded places with Miller) rejected the work of the Taylor panel. Kirin was allegedly concerned that the panel had recommended applicants who had not been cross-trained in all aspects of rail operations. In any event, he directed Miller to come up with a new list.

25. Miller relied in part upon the ratings of the Taylor panel, although he made his final decision based upon a matrix designed by Kirin. Jones was among those considered by Miller, but she was not selected—notwithstanding that she was one of the candidates who was cross-trained. Kirin had instructed Miller to take into account any disciplinary incidents that had occurred within the past three years; Miller purportedly rejected Jones based upon the so-called trailed switch incident, which occurred roughly 1½ years before Miller made his selections.

26. Before he made his final selections, Miller had met with Jones. In a followup letter, he set forth three problem areas for Jones to address in order to improve her prospects for promotion. The trailed switch incident was not among the three.

27. Beginning with the third reason, Miller said that Jones' test score was "marginal." But her score of 75 was better than James Dowtin's 70, and Dowtin was promoted.

28. Miller's second reason was Jones' conduct in the celebrated "farecard incident." Near midnight one summer evening in 1987 at the Dupont Circle Metrorail station, a

female customer attempted to use a $10 bill to purchase a $1.10 farecard to Shady Grove. She needed all the change—over $8.00—to take a cab from Shady Grove to her final destination. Apparently because of a confusing sign (later fixed), the customer did not realize that the farecard machine would only give her about $4.50 in change, so she wound up with a higher valued farecard and less change than she needed.

29. She complained to the station attendant and declined to leave the station. The attendant called the Operations Control Center and OCC contacted Jones, who proceeded to Dupont Circle. Jones talked to the woman, ascertained the problem, collected the appropriate amount of change from the floor of the farecard machine, then gave the woman the change and a trip pass to Shady Grove. In short, Jones used initiative to solve a serious problem for a customer.

30. In so doing, she acted in conformance with the Metrorail Handbook, which provides that "[e]mployees shall attend to reasonable requests from patrons quickly and accurately, avoiding unnecessary referral to other departments." The Handbook also requires employees to "exercise judgment in deciding the safest and wisest course to follow" in situations not specifically covered by the rules. Jones was also acting in furtherance of a recent directive to minimize customer complaints at busy stations such as Dupont Circle.

31. Under these circumstances, Miller's explanation that Jones' conduct violated strict procedures governing access to fare card machines—and hence was a basis for rejecting her promotion to TS-4—was pretextual.

32. The first reason given by Miller is more plausible—but violative of Title VII. In his letter, Miller told Jones that "to transmit your personal views to your subordinates (when in conflict with those of the Authority), was unprofessional and would by necessity be taken into consideration during any review for promotional possibilities." In the court's view, Miller was referring to the letter that Jones and four subordinates sent to Bassily in 1985 protesting discrimination. Miller attempted to deny this; he said he

was referring to Jones having told her subordinates that cross-training was a stupid idea. The court does not find that explanation to be credible.

33. Moreover, WMATA counsel, commenting on the 1987 TS-4 selection, represented to the court that Miller "considered that Ms. Jones' decision to sign a protest letter with subordinates whom she supervised evidenced a below average attitude." [See Order and Memorandum Opinion I, denying WMATA's motion to amend its previous legal memorandum opposing Jones' motion for partial summary judgment.]

34. Indeed, in a matrix that Miller put together on the various candidates, he recorded that Jones "need[ed] to adjust [her] attitude to support WMATA policy"—a view entirely consistent with his resentment over her 1985 discrimination complaint. In sum, the court concludes that the reason Miller rejected Jones for TS-4 in 1987 was her protest of sexual discrimination more than two years earlier.

35. At trial, Miller also testified that Jones was rejected for TS-4 because she had refused to train a subordinate. This reason—like the trailed switch incident—was not among those listed in Miller's October 1987 letter to Jones. Jones had declined for safety reasons to give an individual on-the-job training. Miller reviewed the situation and agreed that the individual could not be properly trained in the one-to-two days Jones would have, so he did not direct her to perform the training. There was nothing in this incident that could have served as a legitimate reason to reject Jones for promotion.

36. The court is making its findings under Title VII independent of the jury's determinations under the ADEA. The jury did not find WMATA liable for retaliation under the ADEA for the refusal to promote Jones in 1987. But to find retaliation under the ADEA, the jury had to determine that Miller refused to promote Jones because she was protesting *age* discrimination. The issue underlying Jones' Title VII claim of retaliation is sex discrimination. On the facts of this case, the protected act under the ADEA was

distinct from the protected act under Title VII.

37. Jones did not first assert age—as opposed to sex or race—discrimination until she filed a charge with the Equal Employment Opportunity Commission on September 11, 1987. Miller made his decision on October 1, 1987, and WMATA has argued that Miller was not aware of the EEOC charge at that time, observing that the Authority did not receive formal notice of the charge from EEOC until sometime in the first week of October. If so, then Miller's rejection of Jones could not have been retaliation under the ADEA.

38. Miller was aware, however, that Jones had protested sex and race discrimination in 1985; and that is the basis upon which Jones claims retaliation under Title VII. WMATA counters that Jones' 1985 letter to Bassily was not protected activity because it was submitted jointly with subordinate employees. The court rejects that argument, see Order and Memorandum Opinion I, and concludes that Bassily refused to promote Jones to TS–4 in 1987 in retaliation for the 1985 protest.

*E. Denial of Promotion to TS–4 in 1988*

39. This litigation encompasses legal claims under the ADEA tried to a jury and equitable claims under both the ADEA and Title VII tried to the court. "When legal and equitable claims are joined in the same act, 'the right to jury trial on the legal claim, including all issues common to both claims, remains intact.'" *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550, 110 S.Ct. 1331, 1335, 108 L.Ed.2d 504 (1990) (quoting *Curtis v. Loether*, 415 U.S. 189, 196 n. 11, 94 S.Ct. 1005, 1009 n. 11, 39 L.Ed.2d 260 (1974)). Accordingly, the court is bound by the factual determinations of the jury insofar as the underlying facts are common to both Jones' ADEA claims and her Title VII claims.

40. The jury was instructed that Jones engaged in protected activity under the ADEA when she filed a complaint with the EEOC in September 1987. That complaint raised Title VII as well as ADEA issues. According to the jury, WMATA reta-

liated against Jones for her EEOC allegations by not promoting her to TS–4 in 1988. When a single protected act implicates both ADEA issues and Title VII issues, and a retaliatory act cannot be shown to have violated one of the statutes but not the other, then the underlying facts are common to both claims and the court will ordinarily defer to the jury.

41. In this instance, the court is aware of no facts—and WMATA has pointed to none—whereby the court could conclude that WMATA refused to promote Jones in retaliation for the ADEA issues that she raised in her 1987 EEOC complaint, but not in retaliation for the Title VII issues raised in the same complaint. In recognition of the common protected act—*i.e.*, the 1987 complaint—and the absence of any evidence that would tie WMATA's retaliation solely to the ADEA issues, the court shall adopt the jury's finding of retaliation, and extend that finding to Title VII.

42. If the court had disbelieved the testimony or other evidence that may have led to a jury verdict in favor of the plaintiff under the ADEA, the court could of course have entered judgment as a matter of law on the jury issues and then proceeded to try the Title VII issues without deference to the jury's findings. Indeed, WMATA has moved for judgment as a matter of law with respect to the 1988 TS–4 denial; but the court has denied that motion. See Order and Memorandum Opinion I.

43. The court, in reliance upon the verdict of the jury on Jones' ADEA claim, finds that WMATA violated Title VII by denying Jones' 1988 promotion to TS–4 in retaliation for her 1987 EEOC complaint. The court notes that it would have reached the same conclusion independent of the jury, based upon the filings and oral argument of counsel, and the testimony and other evidence in the record.

*F. Termination in 1991*

44. Jones filed this suit in March 1989, just after her rejection for the TS–4 job for which she had applied in September 1988. The litigation stalled, however, because Jones' original lawyer became ill. In Febru-

ary 1991 she retained Kator, Scott & Heller, and filed an entry of appearance form for her new counsel.

45. WMATA fired Judy Jones on March 7, 1991, citing alleged insubordination.

46. The jury was instructed that Jones engaged in protected activity under the ADEA when she retained new lawyers to prosecute this lawsuit in February 1991, when she initially filed the lawsuit in March 1989, and when she filed a complaint with the EEOC in September 1987. According to the jury, WMATA retaliated against Jones for one or more of these protected activities by terminating her in March 1991. Each of the protected activities involved both ADEA and Title VII issues.

47. The court is aware of no facts—and WMATA has pointed to none—whereby the court could conclude that WMATA terminated Jones in retaliation for the ADEA issues she raised in her 1987 EEOC complaint or in this lawsuit, but not in retaliation for the Title VII issues. In recognition of the common protected act(s) and the absence of any evidence that would tie WMATA's retaliation solely to the ADEA issues, the court shall adopt the jury's finding of retaliation, and extend that finding to Title VII.

48. The court, in reliance upon the verdict of the jury on Jones' ADEA claim, finds that WMATA violated Title VII by terminating her in 1991 in retaliation for one or more of the protected acts enumerated above. The court notes that it would have reached the same conclusion independent of the jury, based upon the filings and oral argument of counsel, and the testimony and other evidence in the record.

49. This court has previously granted partial summary judgment in plaintiff's favor on her claim that WMATA's refusal to reinstate her after her termination constituted retaliation in violation of Title VII and the ADEA. The findings set forth above on Jones' other retaliation claims are consistent with that determination. The court's findings that WMATA retaliated against Jones by denying her promotion to TS–4 in 1987 and 1988, and by terminating her in 1991,

would be the same even in the absence of the summary judgment determination.

### G. Denial of Promotion to TS–5 in 1987

■ 50. WMATA rejected Jones for the position of TS–5 Quality Assurance Inspector in August 1987, and selected Daniel Epps instead. Unlike Jones' other claims in this case, which involve retaliation for protected acts under both the ADEA and Title VII, here the principal issue is whether WMATA's refusal to promote Jones to TS–5 was the product of discrimination based on sex in violation of Title VII.

51. Quality Assurance (QA) is a unit in the Rail department responsible for monitoring the qualifications and performance of Rail employees. For example, QA inspectors initially certify and periodically recertify Train Operators by administering written examinations and by actually riding on trains and observing the operators' performance. Before the QA unit was formally established in 1985, and for more than a year thereafter, Rail supervisors performed this examination function as a collateral duty in a role called Performance Examiner. Service as a Performance Examiner gave a supervisor a "leg up" on formal promotional opportunities.

52. In late 1985 Judy Jones applied for the collateral duty of Performance Examiner. She secured the recommendation of her supervisor and passed the qualifying examination. Another supervisor, Daniel Epps, passed the qualifying examination at the same time. Epps was selected. Jones' Title VII complaint alleging, among other things, discrimination in the selection of Performance Examiner, was settled in February 1987. In the Stipulation of Dismissal, Jones released WMATA from discrimination claims arising out of the Performance Manager selection.

53. In his capacity as a Performance Examiner, Epps worked with the QA unit. In particular, Epps worked with QA personnel in certifying and recertifying Train Operators, so that he was able to cite his actual experience in QA when he applied for the TS–5 position at issue in 1987.

54. The officials in Rail who were required to approve Epps' promotion were Bassily and Lance Cooper, the head of QA. Wayne Thompson, a supervisor in QA, headed the screening panel that made recommendations to these officials. Kirin's approval was required to transfer Epps out of Rail Transportation.

55. Thompson wrote a summary memorandum that recommended two male finalists for further consideration—Epps and Kenneth Banks. The memorandum gave an overview of the screening process, which included a written essay and an oral interview, and provided overall ratings of the candidates. The memo stated that the completed essays and individual score sheets on each applicant had been retained in the file.

56. The score sheets contained comments on each applicant's responses to interview questions. Thompson opined that without reviewing this information it would be impossible to certify that the rating process was fair. He testified that he gave both the completed essays and the individual score sheets to WMATA's personnel department. WMATA concedes that the material is missing, but explains only that is was lost or mislaid.

57. Thompson's recommendations came only one month before Jones' EEOC charge in September 1987. For that reason alone, argues Jones, WMATA should have taken adequate measures to secure the records. In the absence of an explanation from WMATA, Jones urges the court to exercise its discretion and draw an inference that the records, if produced, would have been adverse to WMATA's defense. The court holds, however, that more than negligence must be shown to support an adverse inference; an adverse inference is available only where there is a showing of "evil intent, bad faith or willfulness." *Vick v. Texas Employment Comm'n,* 514 F.2d 734, 737 (5th Cir.1975). Jones offers no evidence that bad motive contributed to the loss of the essays and the individual score sheets.

58. Thompson cited Epps' breadth of experience in a number of different Rail operations. He was unsure, however, when asked whether Jones had provided comparable information during her interview. The missing score sheets would of course have revealed Jones' responses to the various interview questions. Nonetheless, the court notes that Jones' experience was available to Thompson from her personnel files; moreover, Jones would certainly have informed Thompson of any experience that she thought relevant to the TS–5 promotion.

59. Thompson conceded that Kenneth Banks, who was a finalist for the promotion, had never served as a Train Operator; while Jones, who was not a finalist, came up through the ranks as an operator. Without such experience, argues Jones, it would be difficult for a QA Inspector to assess an operator's performance. However, the court agrees with WMATA that Banks had demonstrated his proficiency in doing the job for months before the selection took place. He was therefore competent to assess an operator's performance. Banks also had extensive and valuable experience in the Operations Control Center (OCC), which Jones lacked. Finally, Banks received 83% of the total possible score on the 12 criteria rated by the panel, while Jones received only 56%.

60. Jones contends that Bassily and Kirin were the officials ultimately responsible for the TS–5 selection in 1987, and that they were hostile to women in general and to Jones in particular. But Jones did not prove that Bassily and Kirin were relevant to the QA selection process. In order to have been selected as QA Inspector, Jones must first have been recommended by the Thompson panel; she was not. There is no testimony that Bassily or Kirin had any role in the decision of the panel to recommend Epps and Banks. Accordingly, the court has no basis upon which to find that animus by Bassily or Kirin played a role in the panel's decision not to recommend Jones, or the ultimate decision to promote Epps.

61. The court concludes that Epps' qualifications were superior to Jones'. He was already a TS–4, with extensive experience at OCC for 14 months; he had previously served as the Division Assistant Superintendent; and he had been involved in the training and development of the utility superviso-

ry staff. Jones had little experience other than her service as a TS-3 Rail Supervisor. She had only five days of training in OCC. Jones received 56% of the total possible score on the 12 criteria rated by the panel, while Epps received 79%.

62. WMATA has met its burden to show a legitimate, non-discriminatory reason for its personnel action against Jones. The plaintiff has not shown that WMATA's reason was pretextual. Therefore, WMATA's refusal to select Judy Jones for the position of Quality Assurance Inspector, TS-5, in 1987, did not constitute discrimination based on sex.

## II. RELIEF

In violation of Title VII, Judy Jones was denied promotions to TS-4 in 1987 and 1988; she was unlawfully fired on March 7, 1991; and she was not thereafter employed by WMATA until her reinstatement on May 10, 1994 by order of this court. The jury has already awarded compensatory damages under the ADEA, but full relief in these circumstances also includes formal reinstatement, retroactive promotion, and back pay, as well as liquidated damages under the ADEA. In addition, an injunction against further reprisal is necessary.

WMATA has represented to the court that, in light of the underlying findings and conclusions by the jury and the court, WMATA does not object to the scope of relief as set forth below, except as to prejudgment interest.

### A. Promotion

■ Jones was unlawfully denied promotions to TS-4 on October 1, 1987 and again in 1988. As relief, WMATA shall promote Judy Jones to TS-4 retroactive to October 1, 1987, with all increases in pay and benefits from that date forward.

### B. Back Pay

Jones is entitled to the difference in pay and benefits between TS-3 and TS-4 from October 1, 1987 to her termination on March 7, 1991. Thereafter she is entitled to back pay at the appropriate TS-4 level for the period when she was out of work—March 7, 1991 to May 10, 1994. Jones was reinstated at the TS-3 level, so she is further entitled to the difference in pay between TS-3 and TS-4 for the period May 10, 1994 until the date when she first actually begins drawing pay as a TS-4.

### C. Prejudgment Interest

Jones requests prejudgment interest against WMATA as a result of her Title VII claims for failure to promote and termination of employment. This court concludes that Ms. Jones is so entitled.

Plaintiff argues that under *Barbour v. Merrill,* 48 F.3d 1270, 1279 (D.C.Cir.1995), there is a presumption in favor of imposing prejudgment interest in Title VII suits, and further, that this court should follow its prior award of such prejudgment interest in this case. Order, August 6, 1992, at 12–13. Defendant WMATA, however, contends that plaintiff misplaces its reliance on *Barbour,* because WMATA enjoys governmental immunity from prejudgment interest awards, whereas in *Barbour* a private entity was involved. WMATA also argues that this court's earlier determination on this issue was erroneous.

Defendant cites *Kingston Constructors v. WMATA,* 860 F.Supp. 886, 890 (D.D.C.1994) for the assertion that WMATA's immunity is a bar to prejudgment interest in such circumstances. *Kingston,* however, dealt with WMATA's immunity while acting in a discretionary capacity with respect to its dealings with contractors for the design, procurement, fabrication, and installation of equipment— and WMATA's subsequent breach of settlement agreements evolving from disputes with those contractors. *Id.* at 887–89. The *Kingston* court found that WMATA retained immunity when acting in a discretionary capacity, and found WMATA was so acting in its dealings with the contractor plaintiffs. That determination, however, is irrelevant to whether WMATA is liable for prejudgment interest arising out of a Title VII action.

WMATA is an employer as defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* As

such, it is liable for, as opposed to immune from, discrimination against its employees on the basis of sex. As this court today finds, WMATA did, indeed, violate Title VII when it denied her promotions in 1987 and 1988, and again when it terminated her employment in 1991. The issue of whether prejudgment interest, an incident of the harm Ms. Jones suffered, should be awarded, follows.

As this court indicated in 1992, prejudgment interest is available for violations of Title VII. *See Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777 (1st Cir.1990) (rehearing denied); *Bunch v. Bullard*, 795 F.2d 384 (5th Cir.1986); *Townsend v. WMATA*, 746 F.Supp. 178, 188 (D.D.C.1990).

Ms. Jones, having suffered injury as a result of unlawful sex discrimination under Title VII, is therefore entitled to prejudgment interest in conjunction with the amounts of back pay awarded in today's order. Memorandum Opinion II, at 22.

### D. Liquidated Damages

█ The jury has determined that WMATA committed willful violations of the ADEA when it refused to promote Jones to TS–4 in 1988, when it terminated her, and when it failed to reinstate her. Under the ADEA, she is entitled to liquidated damages in an amount equal to back pay with respect to any such willful violations. 29 U.S.C. § 626(b). The first ADEA violation found by the jury occurred on or about February 2, 1989. Accordingly, the amount of liquidated damages due Jones is a sum equal to the back pay, computed as indicated at Part B above, for the period from February 2, 1989 through the date upon which she first actually begins drawing pay as a TS–4.

### E. Injunctive Relief

█ Jones seeks broad-based injunctive relief that would prohibit both WMATA and Fady Bassily from retaliating against Jones, and against other employees similarly situated, for engaging in protected EEO activity. Although the scope of relief that she requests is more commonly associated with a class action, Jones argues that a class need not be certified in order to obtain a broad injunctive remedy. *See* 7A CHARLES A. WRIGHT, AR-

THUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1771, at 409 (1986) (relief for individual civil rights plaintiff may benefit all persons subject to unlawful practice). Jones further maintains that the injunction must extend to similarly situated WMATA employees because of the pervasive nature of Bassily's retaliatory practices. *See Bailey v. Patterson*, 323 F.2d 201, 205–06 (5th Cir.1963), *cert. denied*, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964) (inflexible, undeviating official policy of segregation dictates that injunction cover all persons similarly situated).

WMATA responds that it has no objection to a narrowly worded injunction prohibiting WMATA (only) from retaliating against Jones (only). But because this case was pleaded and tried as a single disparate treatment claim, WMATA protests the scope of the relief sought by Jones. WMATA reminds the court that Jones did not request injunctive relief at all in her Third Amended Complaint, or even in her Pretrial Statement. By contrast, the injunctive relief in *Bailey*, upon which Jones relies, was sought from the beginning; moreover, the objective of that relief was to prohibit racial segregation on common carriers and in transportation terminals—a goal which could not practically be limited to one plaintiff. WMATA points instead to *Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 361 (1st Cir.1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990), where the court narrowed a broad injunction against sex discrimination so that it protected only the plaintiff.

In this instance, the jury was not asked to find retaliation against other employees; nor was Jones' case built upon statistical evidence of disparate impact. That the court credited some third party evidence of retaliation is insufficient to justify the sweeping relief that plaintiff seeks. Indeed, in *Townsend v. WMATA*, 746 F.Supp. 178 (D.D.C. 1990), the court found discrimination but explicitly did not find retaliation. Furthermore, Bassily is neither a party to this lawsuit nor presently a WMATA employee; an injunction against him would raise due process concerns.

The court, therefore, agrees with WMATA that injunctive relief must be limited to prohibiting WMATA from retaliating against Jones for engaging in protected EEO activity.

### F. Attorneys' Fees

Under Title VII, 42 U.S.C. § 2000e–5(k), and the ADEA, 29 U.S.C. §§ 626(b), 216(b), Jones is entitled to reasonable attorneys' fees.

Pursuant to Fed.R.Civ.P. 54, the court shall enter final judgment on legal and equitable relief for the plaintiff. A separate order shall issue this date.

### FINAL JUDGMENT AND ORDER II

Upon considering the arguments of counsel, testimony from witnesses at trial, exhibits received in evidence, and for the reasons more fully set forth in accompanying Memorandum Opinion II, the court hereby enters final judgment on the non-jury issues tried before the court.

The court finds that defendant Washington Metropolitan Area Transit Authority (WMATA) retaliated against plaintiff Judy Jones in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., when WMATA denied Jones' promotion to TS–4 in 1987 and again in 1988, and when WMATA terminated Jones in 1991. The court rejects Jones' claim that WMATA discriminated against her on the basis of sex in violation of Title VII when it denied her promotion to TS–5 in 1987.

Based upon these findings, and the prior findings of the jury under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et seq., the court hereby orders the following relief:

1. *Reinstatement and Promotion.* Jones is entitled to reinstatement with WMATA. Jones shall be promoted to TS–4 effective October 1, 1987 and will be accorded all increases in pay and benefits that would ordinarily accrue to an employee promoted to TS–4 on that date.

2. *Back Pay.* WMATA shall pay Jones a sum equal to the total of (a) the difference in pay and benefits between her actual earnings as a TS–3 and what she would have earned as a TS–4 for the period October 1, 1987 to March 7, 1991, (b) what she would have earned as a TS–4 for the period March 7, 1991 to May 10, 1994, and (c) the difference between her actual earnings as a TS–3 and what she would have earned as a TS–4 for the period May 10, 1994 to the date when WMATA formally places Jones on the payroll as a TS–4. The parties shall endeavor to stipulate the amount of back pay due under this formula and shall report to the court in 30 days, either setting forth the stipulated amount or explaining any differences requiring the court's resolution.

2. *Prejudgment Interest.* WMATA shall pay Jones prejudgment interest accordingly. The parties shall endeavor to stipulate the amount of prejudgment interest due and shall report to the court in 30 days, either setting forth the stipulated amount or explaining any differences requiring the court's resolution.

3. *Liquidated Damages.* WMATA shall pay Jones a sum equal to the amount of back pay, computed as provided in Paragraph 2, for the period commencing on February 2, 1989 and terminating on the date when WMATA formally places Jones on the payroll as a TS–4. The parties shall endeavor to stipulate the amount of liquidated damages due under this formula and shall report to the court in 30 days, either setting forth the stipulated amount or explaining any differences requiring the court's resolution.

4. *Injunctive Relief.* WMATA is hereby permanently enjoined from taking any form of retaliatory action against Jones for engaging in activity protected by Title VII or the ADEA, including formal or informal presentation of complaints of discrimination.

5. *Attorneys' Fees.* Jones is entitled to reasonable expenses and attorneys' fees. The parties shall confer and seek to agree on the amount of fees and expenses due. If the parties are unable to agree, Jones shall submit a fee application in 30 days.

SO ORDERED.